996 So.2d 590 (2008)
Melanie CRANFORD
v.
LOUISIANA STATE BOARD OF PRACTICAL NURSE EXAMINERS and Claire Doody Glaviano, In Her Capacity as Executive Director, and Eugene St. Martin, In His Capacity as Chairman, of the Louisiana State Board of Practical Nurse Examiners.
No. 2008-CA-0209.
Court of Appeal of Louisiana, Fourth Circuit.
October 1, 2008.
*591 Rowena T. Jones, David H. Williams, New Orleans Legal Assistance, New Orleans, *592 LA, for Plaintiff/Appellant, Melanie Cranford.
Francis B. Mulhall, Metairie, LA, for Defendants/Appellees The Louisiana State Board of Practical Nurse Examiners, et al.
(Court composed of Chief Judge JOAN BERNARD ARMSTRONG, Judge PATRICIA RIVET MURRAY and Judge ROLAND L. BELSOME).
JOAN BERNARD ARMSTRONG, Chief Judge.
In February, 2007[1], the Louisiana State Board of Practical Nurse Examiners (hereinafter "the Board") filed a formal complaint against Melanie Cranford, a Licensed Practical Nurse (hereinafter "L.P.N."), alleging violation of La.R.S. 37:969 A(4)(f) and La. Admin. Code 46:306 T(8)(a), (b), (c) and (j). On February 9, 2007, Ms. Cranford filed a formal declaration denying the allegations contained in the complaint and advising the Board that she would appear for the formal hearing the Board had scheduled for February 27, 2007. The evidentiary hearing was held as scheduled before Hearing Officer Patricia Juneau, Registered Nurse (hereinafter "R.N."). The Board was represented by counsel, Francis Mulhall, its Executive Director, Claire Glaviano, R.N., and its Compliance Officers Tammy Labit and Kiana Gauthrbaux. Ms. Crawford testified, as did witnesses Lisa Ainsworth, R.N., Rena Sookoo, Certified Nursing Assistant (C.N.A.), Rosa Smith, C.N.A., Stacey Lowery, L.P.N., Margaret Kell, L.P.N., and Donna Barnes, R.N.
On April 9, 2007, the Hearing Officer issued Findings of Fact and Conclusions of Law, on the basis of which she made a formal recommendation to the Board that Ms. Crawford's nursing license be revoked, and that she be fined $500 and assessed $500, which fine and assessment were to be paid within ninety days of the notice of recommendation.
On April 27, 2007, the Board issued an order concluding that Ms. Crawford had violated La.R.S. 37:969 A(4)(f) and (g), and La. Admin. Code 46:306 T(a), (b), (c) and (j), and adopted the Hearing Officer's recommendations that Ms. Crawford's nursing license be revoked and that she be fined and assessed a total of $1,000.
La.R.S. 37:969(A)(4)(f) and (g) provide:
A. The board shall:
(4) Conduct hearings upon charges calling for discipline of a licensee, or for revocation, denial or suspension of a license issued or applied for under this Part upon proof that the person:
(f) Is guilty of unprofessional conduct; or
(g) Has violated any provisions of this Part.
La. Admin. Code 46:306 T(8)(a), (b), (c) and (j) provide:
T. The grounds for disciplinary proceedings include, but are not limited to:
(8) being guilty of unprofessional conduct; unprofessional conduct includes, but is not limited to the following:
(a) failure to practice practical nursing in accordance with the standards normally expected;
(b) failure to utilize appropriate judgment in administering nursing practice;
(c) failure to exercise technical competence in carrying out nursing care;
(j) intentionally committing any act that adversely affects the physical or psychosocial welfare of the patient.
*593 On May 22, 2007, Ms. Cranford filed a Petition in the district court for review of the administrative adjudication pursuant to La.R.S. 49:964, et seq.
In her petition for review of the Board's order, Ms. Crawford contends that she has been deprived of her substantial rights to her L.P.N. license and employment thereunder without due process of law, that the Board's order was illegal as a matter of law, arbitrary, capricious and clearly erroneous, and not supported by sufficient evidence.
Ms. Cranford filed a Rule to Show Cause why the Board's April 27, 2007 order should not be vacated or reversed, or other relief granted, and a declaratory judgment issue. Following a hearing on the rule held on December 14, 2007, the trial court affirmed the Board's order and denied Ms. Cranford's request for a declaratory judgment by judgment dated December 18, 2007. On January 14, 2008, Ms. Cranford filed a Motion and Order for appeal in forma pauperis. This appeal followed. For the reasons that follow, we affirm the decision of the trial court.
The formal complaint the Board addressed to Ms. Cranford consisted of a three-page notice, advising Ms. Cranford of the date, time and place of the hearing and of the nature of the charges made against her. These charges included the following issues, which were identified in the formal complaint as non-exclusive:
(1) April 18, 2006 report from Lacombe Nursing Center alleging that on March 14, 2006, Ms. Cranford had been cited for neglect and psychological/emotional and verbal abuse.
(2) March 15, 2006 report of a Department of Health and Hospitals (DHH) investigation that found that (a) Ms. Cranford positioned a resident, M.C.,[2] from the dining room to a dimly lit hall area and left the patient for forty-five minutes. To insure that M.C. was fed, a C.N.A. got M.C.'s food tray and attempted to feed her. Ms. Cranford stopped her and placed the cold food tray in front of M.C. and left it without helping to feed M.C.; and (b) When another resident and his family member called to report this behavior, Ms. Cranford yelled at them rudely and slammed the door while the resident was still speaking.
(3) According to Ms. Cranford's written narrative submitted to the Board, her mother, a resident of the facility, was left neglected and uncared-for. Ms. Cranford continued to work for the facility to insure her mother's safety and denies the allegations.
(4) July 19, 2006: The Board received a second DDH report concerning Ms. Cranford's practice as an L.P.N. According to the DHH report, Ms. Cranford put a resident in his room and closed the door to isolate him as punishment for his having come to the door to complain to her during her medication pass.
(5) The Board received Ms. Cranford's response to the July 19, 2006 charge. According to Ms. Cranford, after having left Lacombe Nursing Center, she took her mother to Pontchartrain Healthcare Center (hereinafter "Pontchartrain") and began working there without incident. She then complained that her mother was being mistreated and asked that she be moved to the hall where Ms. Cranford worked. Pontchartrain then suspended Ms. Cranford for having turned down a resident's television set. Ms. Cranford alleged *594 that the resident was screaming loudly for his C.N.A. and awakened another resident. Ms. Cranford called for help to no avail, and placed the resident in his room, closing the door to keep the hall secure while she tried to locate the other L.P.N. or C.N.A. Both finally appeared. According to Ms. Cranford, she mentioned the event to the resident's family members at a later date, and they agreed she had acted properly.
The formal complaint provided that Ms. Cranford's response, if any, to the complaint was due ten days prior to the hearing. She was also advised in the complaint that her legal rights and options were provided for in attached information concerning the formal hearing process.
Attached to the formal complaint sent to Ms. Cranford was a copy of La. Admin. Code 46:306, setting forth the provisions of the Louisiana Administrative Code relating to adjudication proceedings for Licensed Practical Nurses. The attachment detailed provisions relating, inter alia, to the confidentiality of the proceedings, Ms. Cranford's discovery rights, her right to retain an attorney to represent her interests before, during and after the proceedings, her right to subpoena witnesses, the grounds for imposition of discipline and the types of discipline, including reprimand, probation, suspension, revocation of license, and penalties, that could be imposed by the Board.
As agreed to by Ms. Cranford, the administrative hearing began on February 27, 2007. At the outset, Board counsel advised Ms. Cranford of her right to question the Board's witnesses and to call her own witnesses and introduce exhibits. Before the first witness was sworn, Ms. Cranford was again given a copy of the formal complaint and given the opportunity to address any of the allegations it contained. Ms. Cranford acknowledged that she had received a copy of the complaint previously.
Ms. Cranford denied the claim that on March 15 she left a resident in a dimly lit hall for forty-five minutes. According to Ms. Cranford, M.C. was alone in a dimly lit area of the dining room when Ms. Cranford removed her to a brightly lit television room where there were many other people. Ms. Cranford said that she moved M.C. to insure that she did not eat until she had tested M.C.'s blood sugar level. After having tested M.C.'s blood sugar, Ms. Cranford fed her.
Ms. Cranford also denied the claim that another resident and his family member called to report her behavior. According to Ms. Cranford, she answered the call light at the nurses' station and overheard the C.N.A.s grooming the resident and telling him, "Go ahead and tell them, tell them she did this, tell them she did that." Ms. Cranford said she walked to the room, knocked on the door and addressed her comments to the C.N.A.s, not to the resident.
Ms. Cranford claimed that the complaints against her grew out of her own concern for her mother and the desire of a new administrator to "get" her. Furthermore, Ms. Cranford claimed that her mother and, presumably other residents, received poor care at both Lacombe and Pontchartrain, and that the administrative attack on her was initiated in order to divert attention from the inadequacies at those facilities.
The day after the incident, Lacombe filed a Twenty-Four Hour Notification of Abuse/Neglect Form HSS-AB-03, admitted into evidence at the conclusion of the hearing. According to that report, Ms. Cranford was charged with neglect, psychological/emotional and physical abuse of M.C. and of E.F. M.C. was described as *595 having been diagnosed with dementia, diabetes, hyperlipidemia, hypothyroidism, HTN, end-stage disease with terminal agitation. M.C. could answer to her name and make her basic needs known about eighty percent of the time, was non-ambulatory and required extensive assistance. According to the report, the charge of neglect of M.C.'s basic needs and inappropriate reaction to her behavior were substantiated. E.F. was described as having been diagnosed with malaise and fatigue, HTN, BPH and general symptoms of deconditioning. He was alert and oriented, independent in mobility, receiving skilled therapy and getting stronger. According to the report, the charge of verbal abuse of E.F. was substantiated. The report concluded that the facility found the charges against Ms. Cranford were substantiated and that its investigation confirmed abuse/neglect. The matter was referred to the L.P.N. Board.
Lisa Ainsworth, R.N., testified that she has been employed at Lacombe for fifteen years, first as an L.P.N. and, since May of 2005, as an R.N. At the relevant times, and at the time she gave her testimony, she served as Lacombe's Director of Nursing. According to Ms. Ainsworth, in early May, 2006, L.P.N. Stacey Lowery made a formal written statement against Ms. Cranford, on the basis of which Ms. Ainsworth conducted an investigation. Ms. Lowery claimed that Ms. Cranford said that she removed M.C. from the general dining room to an unstaffed area because M.C. was disturbing residents, including Ms. Cranford's mother. According to Ms. Lowery's statement, M.C. was not fed in the new location and, when other staff members tried to return M.C. to the dining area in order to give M.C. her tray, Ms. Cranford pushed M.C. out of the area on at least one more occasion, claiming she was being loud. Staff members Rose Smith, C.N.A. and Rena Sookoo, C.N.A. reported to Ms. Ainsworth that they had tried to return M.C. to the dining hall, but that Ms. Cranford did not allow them to do so. Ms. Smith reported that when she asked Ms. Cranford if M.C. had been fed prior to her removal, Ms. Cranford replied that she would feed her, and that she had moved her because M.C.'s loud behavior had made it difficult for Ms. Cranford's mother to eat. Ms. Smith did not observe M.C. being fed her dinner. The incident was confirmed to Ms. Ainsworth by a resident couple, E.F. and T.F.[3], who lived in a room near the area to which Ms. Cranford had brought M.C. Ms. Sookoo and Ms. Smith heard E.F. complaining to Ms. Cranford of her treatment of M.C., whereupon, Ms. Cranford told him not to "mind her business" and slammed the door.
In the course of her investigation of the incident, Ms. Ainsworth asked E.F. if he had had any problems the night before. He told her he had a problem with Ms. Cranford, because she put a lady in the hall and did not feed her because she was being too loud. When he confronted Ms. Cranford, she told him to mind his own business and slammed the door in his face.
Ms. Ainsworth also interviewed Ms. Sookoo and Ms. Smith, and found that their statements coincided with those of E.F. and Ms. Lowery. Ms. Ainsworth also checked M.C.'s blood sugar readings the morning after the incident and found that her blood glucose level was very low, indicating that M.C. received less nutrition the night before than she should have received[4].
*596 After having interviewed the witnesses, reviewed the written statement, and obtained objective evidence confirming the fact that M.C.'s morning blood sugar was abnormally low, indicating a deficiency in the prior evening's nutrition, Ms. Ainsworth reviewed Ms. Cranford's file and noted two prior negative "write-ups[5]." She then called in Ms. Cranford, who denied the charges. In the presence of Roxanne Armond, R.N., Ms. Ainsworth terminated Ms. Cranford's employment for violation of a company policy providing zero tolerance for resident abuse or neglect and for having three negative write-ups.
Ms. Cranford cross-examined Ms. Ainsworth at the hearing, essentially making claims of misconduct by other members of the staff, improper treatment of Ms. Cranford's mother and personal use of office equipment by other staff members. The questions did not address Ms. Ainsworth's investigation of the dining room incident.
During her cross-examination of Ms. Ainsworth, Ms. Cranford claimed that she took M.C. out of the dining room to the television room in order to perform an Accucheck, which was not allowed to be performed in a public area such as the dining room. On examination by Ms. Glaviano, Ms. Ainsworth testified that the television room, as it was occupied by other residents at the time, was also a public area, in which an Accucheck was not allowed to be performed.
Rena Sookoo, C.N.A., testified that she has been a C.N.A. for six years, employed at Lacombe, where she worked with Ms. Cranford. She testified that on March 14, 2006, she was in the Lacombe dining room when she observed Ms. Cranford take a resident out of the dining room and put her in the hallway. Ms. Cranford told Ms. Sookoo that she removed M.C. from the dining room because M.C. was preventing Ms. Cranston's mother from eating. According to Ms. Sookoo, a family member and E.F. and T.F. were upset by Ms. Cranston's treatment of M.C. When M.C.'s dinner tray came out, Ms. Cranford prevented C.N.A. Rose Smith from bringing M.C. back into the dining room to eat her dinner. Ms. Sookoo heard Ms. Cranford tell Ms. Smith that she should not bring M.C. back into the dining room because she was making too much noise and disturbing Ms. Cranford's mother. Ms. Smith then put the tray in the dining room, and Ms. Cranford said she would feed M.C. after she had finished feeding her own mother. After Ms. Cranford had finished feeding her mother, Ms. Sookoo saw Ms. Cranford place M.C.'s tray in front of her and walk away. According to Ms. Sookoo and the DHH report, M.C. was unable to feed herself.
When questioned by Ms. Glaviano, Ms. Sookoo testified that Ms. Cranford was yelling when she told Ms. Smith not to bring M.C. back into the dining room.
Rose Smith, C.N.A., testified that she has been employed by Lacombe for approximately two years. On March 14, 2006, Ms. Cranford rolled M.C. out of the dining room because she was making noise. Since it was time for M.C. to receive her tray, Ms. Smith tried to bring her back to the dining room, but was *597 prevented by Ms. Cranford, who told Ms. Smith that she was trying to feed her mother. Ms. Cranford told Ms. Smith that she would feed M.C. later. According to Ms. Smith, Ms. Cranford did not feed M.C., but merely set her tray on the table adjacent to M.C.'s reclining chair. Ms. Smith confirmed that M.C. was unable to feed herself. Ms. Smith testified that Ms. Lowery told her that M.C. did not eat that evening.
Ms. Cranford cross-examined Ms. Smith, and insisted that they had had a conversation, which Ms. Smith denied. Ms. Smith also denied that Ms. Cranford brought trays to M.C. and fed her. Ms. Smith also denied that Ms. Cranford came back to feed M.C. after she had checked M.C.'s blood sugar level.
When questioned by Ms. Juneau, Ms. Smith testified that she was in the dining room during the entire incident, and did not see Ms. Cranford feed M.C.
Stacey Lowery, L.P.N., testified that she has been an L.P.N. for about three and a half years, and was employed at Lacombe as an L.P.N. in March of 2006. At the time of the dining room incident, Ms. Lowery was the charge nurse. She noticed M.C. sitting in a back hall during the dining hour and pushed M.C. into the dining room so that she could be fed her dinner. Ms. Lowery returned to the hall to finish passing out medications. Later, as Ms. Lowery finished her work, she noticed that M.C. was sitting outside the therapy room at the back side of the dining area, without a plate in front of her. Ms. Lowery asked the C.N.A.s if M.C. had eaten, and was advised that Ms. Cranford was going to feed her after having fed her own mother. Later, Ms. Lowery noticed M.C. was still sitting with the tray in front of her but, since she could not feed herself, it was apparent that M.C. had not eaten. Ms. Lowery attempted to feed her later, but her food had gotten cold. M.C. ate some of her shake and a little of her dinner. Ms. Lowery identified her written statement.
Ms. Lowery testified that later that night some family members came to her expressing concern that M.C. had been pushed into a dim area with no one around to take care of her. Other residents said they had asked to report M.C.'s isolation to the charge nurse, but that Ms. Cranford told them it was none of their business, was rude to them and shut the door. These residents were under the impression at the time that Ms. Cranford was the charge nurse, an impression that Ms. Cranford did not correct.
Margaret Kell, L.P.N., testified that she has been an L.P.N. for over twenty years, and was so employed at Lacombe in March of 2006. She was feeding a patient in the dining room at the time of the incident on March 14, 2006. At that time, M.C. was screaming, and Ms. Cranford pushed her out of the dining room. Ms. Cranford had been attempting to feed her own mother, who was not eating, and told Ms. Kell that she was removing M.C. from the dining room because she believed that her mother could eat much better if she did not have M.C.'s distraction. Some time later, Ms. Lowery brought M.C. back into the dining room, whereupon Ms. Cranford and Ms. Lowery, according to Ms. Kell, "had some words." Ms. Kell left to administer medications. Ms. Kell identified the statement she gave in response to a request by the Board. Ms. Kell was unaware of a problem until she received the Board's request in the mail.
When cross-examined by Ms. Cranford, Ms. Kell denied that she saw Ms. Cranford feed M.C. and denied having seen a patient choking in the dining room.
*598 Pontchartrain filed a twenty-four hour notification to the Department of Health and Hospitals concerning a charge against Ms. Cranford for alleged psychological/emotional abuse of Pontchartrain resident F.L.[6] A copy of the notification form with attachments was introduced into evidence at the administrative hearing. According to the notification, two employees reported that Ms. Cranford put F.L. in his room and closed the door to isolate him for having come to the door to complain to her during her medication rounds. Ms. Cranford told the witnesses to "leave him in there until he learns how to act." The notification referred to a video-tape of the incident. The notification indicates that Pontchartrain's investigation substantiated and confirmed abuse/neglect of F.L. by Ms. Cranford.
Ms. Cranford denied the claim that she had isolated F.L. improperly in his room. According to Ms. Cranford, she was the only nurse with the residents when F.L. started screaming because he was trying to get up and another resident from his room was also having a problem. She then saw a resident walking down the hall who never got out of bed. She kept calling out for assistance, and then placed F.L. in his room for his own protection and that of the other residents.
Donna Barnes, R.N., testified that she has been a registered nurse since 1998, and was employed as Director of Nursing at Pontchartrain prior to December of 2006, when she relocated to Northshore Living Center. According to Ms. Barnes, Ms. Cranford was employed at Pontchartrain as an L.P.N. in July of 2006.
Ms. Barnes began working at Pontchartrain on or about July 19, 2006. About two days later, the center's administrator called her in to show her a film and statements from some employees concerning a male resident who was known as a "screamer". According to the employees, Ms. Cranford had pushed him into his room and shut the door to isolate him, more as punishment than to quiet the resident. She viewed the film of the incident and placed Ms. Cranford on three days' suspension pending an investigation.
Ms. Barnes called Ms. Cranford in that Friday; they discussed the situation and viewed the film together. Ms. Cranford said that she had had a rough day and that F.L. was yelling and disturbing people. Ms. Cranford claimed that she put the man in his room without the intention of punishing him, but rather to keep him from disturbing others. Ms. Barnes testified that it was her intention to be lenient to the nurse, and to give her every opportunity. She then pulled Ms. Cranford's employee record and noted an incident a month or two before in which Ms. Cranford had been written up for a verbal altercation with a patient whose television was being played too loudly.
Ms. Cranford was not happy about her suspension, and, when Ms. Barnes returned to work on Monday, she received Ms. Cranford's resignation, which had been shoved under Ms. Barnes' door.
A copy of the resignation was introduced into evidence at the hearing. Ms. Cranford wrote:
7/21/06
After tremendous anger over recent events and subsequent spiritual renewal, I have elected to remove myself from the turmoil @ PHCC.
St. Francis said it best (I'm sure you're familiar w/the prayer).
I can't abide the nursing profession anymore. It's destroying my soul.

*599 I have NEVER reported any facility I have worked for out of respect for the people I work with, knowing they mean no harm, and yet I am reported for what I perceive as petty instances experienced by everyone.
I ask God to bless us all and to stop the pain and incompetence that besieges PHCC, and I ask you to please act as advocate on behalf of my mother.
I resign my position @ PHCC effective immediately.
Melanie Cranford
Ms. Barnes accepted the resignation and later, when Ms. Cranford asked to rescind her resignation, Ms. Barnes denied her reinstatement.
Ms. Barnes submitted reports of the incident to the Board and to the State, together with Ms. Cranford's resignation, the employee statements, her own statement and a statement from a social worker to the effect that Ms. Cranford had said she would "change her plans for [Ms. Barnes] or for [Pontchartrain]" if she were to be re-hired. This scared Ms. Barnes, as she assumed the comment was meant as a threat to call in the State on either Ms. Barnes or Pontchartrain. According to the social worker's statement, Ms. Cranford said, "If they kick my mother out, I will slit my own throat."
Ms. Cranford cross-examined Ms. Barnes at the hearing. Ms. Cranford argued that she had placed the male resident in his room for his own safety, and in fear that he would pull down the medication cart. Ms. Barnes responded that she could see that Ms. Cranford was frustrated, and that it is common in a nursing home for one's nerves to become frayed, so she was trying to give Ms. Cranford the benefit of the doubt. However, the two co-workers gave statements indicating that Ms. Cranford placed the resident in his room as a form of punishment. Ms. Cranford then questioned Ms. Barnes concerning one of the reporting co-workers, Beanie Edwards, L.P.N. Ms. Cranford alleged that Mr. Edward frequently left the facility at 9:30 every Friday, but was never reported to the State and is still employed by Pontchartrain. Ms. Barnes responded that she was not aware he left at 9:30, but had counseled him concerning some documentation issues. Ms. Cranford claimed that Karen Kelly told her "they were out to get" her, and Ms. Barnes denied knowledge of that. Ms. Barnes testified that she never felt that there was a personal threat against Ms. Cranford, other than Ms. Cranford's own statements that she would kill herself if her mother were not allowed to remain at Pontchartrain, and that she would camp out on Pontchartrain's lawns if she were to lose her nursing license.
Ms. Cranford then made the following statement at the invitation of Board counsel:
The verbal relevance I have regarding [Beanie Edwards] is that he's saying things like he's suspicious of me. This man has made physical overtures towards me, this man has made inappropriate comments to me. This man has left the facility with people and not even given me report or told me he was leaving. And I would suggest, if that's okay, that perhaps he wanted to get rid of me for his own best interest.
* * *
Also, I would like to write out something against him. Is it too late?
Board Counsel replied, "Well, that's not appropriate for this particular hearing because this hearing is about you." Ms. Cranford then said:
Because I thought that had been done, seeing as how I told people about *600 this, explained to him, nothing got done about that. I get called on the carpet for 
* * *
For the record, I would like to say that everything I have done has been for the best interest of my patients. I've been a nurse for thirty years almost. Not quite, almost thirty years. I've never had any complaints. I presently work at Louisiana Heart Hospital as an L.P.N. I have no complaints from anyone. These people are afraid of me because they know they're wrong. They didn't take care of my mother appropriately. They left her hanging out of a wheelchair right directly from the hospital, had somebody with no license try to take off her orders. They are blatantly absolutely wrong and they're trying to cover for themselves.
Board counsel asked to which facility Ms. Cranford was referring, and she replied:
They're the same facility, in essence they are the same people. Ms. Lynette owns Pontchartrain, Mr. Ronnie Goux owns the other one. Their sons are attorneys for both. Their inheritance would be from both. They are one and the same. They're Goux properties. I went to Pontchartrain knowing that. I was aware of this, and I was aware this would probably occur, but I had no choice. I had no transportation to get anyplace else. My car would run hot if I went beyond a certain perimeter. I had to be where I could look at my mother because they would have killed her by now. I mean that is a fact. So I'm there every day. I look in on her every single day. I try to protect her. The other residents, I try to look after them. But [M.C.] was the one of the people I would bring in my circle, my personal circle, when I would visit my mom. I would take care of her and talk to her and they would leave her stuck somewhere in the dark, stuck in the room with the door closed. For the record, I'm saying I am innocent of doing anything that would compromise anybody's safety or integrity. I never abused anybody, and I never neglected anybody.
Ms. Glaviano questioned Ms. Cranford at the hearing. She asked why Ms. Cranford had not reported any of the improper or inadequate care of which she complained at the hearing. Ms. Cranford claimed that she reported an incident concerning Ms. Lowery's treatment of her mother's foot to the Director of Nurses. She admitted she had not reported it to the Board and admitted to ignorance of the rule requiring a report of any negligence or abuse to the Board.
The Louisiana Administrative Procedure Act, in La.R.S. 49:964(G), sets forth the exclusive grounds upon which an administrative agency's decision may be reversed or modified on appeal. The reviewing court, in this case the Civil District Court for the Parish of Orleans, may reverse or modify the Board's decision if the appellant's substantial rights have been prejudiced because the administrative findings, inferences, conclusions, or decisions are:
(1) In violation of constitutional or statutory provisions;
(2) In excess of the statutory authority of the agency;
(3) Made upon unlawful procedure;
(4) Affected by other error of law;
(5) Arbitrary or capricious or characterized by abuse of discretion or clearly unwarranted exercise of discretion; or
*601 (6) Not supported and sustainable by a preponderance of evidence as determined by the reviewing court.... La.R.S. 49:964 G.
In the application of La.R.S. 49:964 G(6), the district court shall make its own determination and conclusions of fact by a preponderance of evidence based upon its own evaluation of the record reviewed in its entirety upon judicial review.[7] In the application of the rule, where the agency has the opportunity to judge the credibility of witnesses by first-hand observation of demeanor on the witness stand and the reviewing court does not, due regard shall be given to the agency's determination of credibility issues. La.R.S. 49:964 G(6); Reaux v. Louisiana Bd. of Medical Examiners, 02-0906, p. 3 (La.App. 4 Cir. 5/21/03), 850 So.2d 723, 726.
This Court discussed the standard of review in cases involving disciplinary orders issued by professional boards in Armstrong v. Louisiana Bd. of Medical Examiners, 03-1241, p. 11 (La.App. 4 Cir. 2/18/04), 868 So.2d 830, 838. In that case, a physician sole practitioner appealed a trial court judgment affirming a disciplinary order imposed by the Louisiana State Board of Medical Examiners for violation of the board's rules concerning treatment of non-cancer-related chronic or intractable pain in his treatment of eleven patients. In upholding the trial court's affirmance of the disciplinary order, this Court noted that Louisiana jurisprudence recognizes that in reviewing these cases, courts must be cognizant of "the strong presumption of validity and propriety" of the administrative action, where the judgment imposed on a professional's behavior is a matter peculiarly within the expertise of an agency composed of members of that profession. Armstrong v. Louisiana State Bd. of Med. Examiners, p. 11, 868 So.2d at 838, citing Montalbano v. Louisiana State Bd. of Med. Examiners, 89-1520 (La.App. 4 Cir. 4/26/90), 560 So.2d 1009, 1011.
Given the jurisprudential presumption of correctness of an agency's actions, Ms. Cranford bears the burden of proving that the record contains no facts that would establish the validity of the charges levied against her. See, Armstrong v. Louisiana State Bd. Of Med. Examiners, p. 11, 868 So.2d at 838.
The issue before us is whether, given this presumption and these considerations, the record contains a preponderance of evidence supporting the Hearing Officer's findings and conclusions, as adopted by the Board. We note that the presumption must be read against the explicit statutory pronouncement that the reviewing court is to determine upon its independent review of the record as a whole whether the agency proved its case by a preponderance of the evidence. La.R.S. 49:964 G(6).
We note that among the Hearing Officer's factual findings was a specific conclusion that the Board's witnesses were credible, and rejecting Ms. Cranford's testimony.
Ms. Cranford claims that the Board's decision was not supported by a preponderance of competent evidence. Ms. Cranford contends that the Board's failure to call M.C., T.F., E.F. and F.L. gives rise to a presumption that their testimony would support her, citing Deloume v. Div. of Emp. Sec., 5-112 (La.App. 5 Cir. 10/12/82), 420 So.2d 1199 and Marion v. New Orleans Public Service, Inc., 6567 (La.App. 4 Cir. 12/30/74), 306 So.2d 758. In the Deloume case, a decision concerning the denial of unemployment benefits, the owners of the company in which the plaintiff was employed did not testify, and the *602 presumption was applied against the company. The court found that the owners' testimony was critical to prove the working conditions at the company. The court applied the presumption that the owners' testimony would be adverse to the company because the owners were within the company's control. There is no evidence that the Pontchartrain and Lacombe residents and their families are subject to the control of the Board. Indeed, it is apparent from the descriptions provided in the Department of Health and Hospitals notification reports that M.C. would be incapable of testifying. Likewise, Ms. Cranford has not shown that the other residents would be able to appear and testify at the hearing. On the facts before us, we cannot conclude that the element of control in the instant case would justify imposition of the presumption.
Ms. Cranford also relies on this Court's opinion in the Marion case, which arose out of an intersectional collision between a streetcar and an automobile. There, we recognized the general rule that the adverse presumption arises where a party fails to call a witness under his control who possesses peculiar knowledge essential to the party's claim. Because the witness in that case, another streetcar motorman, did not arrive on the scene until after the accident had occurred, this Court did not apply the presumption. The family members of the victims in the instant case stand in a similar position to that of the second motorman in Marion in that they did not witness the neglect or abuse of their family member. As in Marion, application of the presumption that the family members' testimony would be adverse to the Board in the instant case would be inappropriate.
Ms. Cranford also contends that the Board relied on incompetent hearsay to support its determination. As detailed hereinabove, both Lacombe and Pontchartrain conducted thorough investigations of the charges against Ms. Cranford, questioning her as well as the professional nurses and nursing assistants who witnessed the incidents. The testimony of those who witnessed the incidents cannot be deemed to be hearsay, and clearly preponderates to support the Board's findings of neglect and abuse of M.C., E.F. and F.L.
Ms. Cranford claims that the Board's decision is arbitrary and capricious and constitutes an abuse of discretion because the penalty was imposed without regard to the totality of circumstances and mitigating factors. An administrative decision is arbitrary when the administrative agency has disregarded evidence or given inappropriate weight to evidence; the decision is capricious when the agency's conclusion has no substantial basis or is contrary to substantiated competent evidence. See, Coliseum Square Ass'n v. City of New Orleans, 88-1837 (La.1/30/89), 544 So.2d 351.
Ms. Cranford contends that the Board acted arbitrarily and capriciously in accepting as credible all adverse witnesses, despite what she characterizes as inconsistencies, and in rejecting her own credibility, allegedly because she attempted to mount a defense and impeach adverse witnesses. Our review of the transcript of testimony before the hearing officer convinces us that there were no discernible, substantial discrepancies among the accounts of the incidents given by the Board's witnesses. The only inconsistencies exist between the Board's witnesses on the one hand, and Ms. Cranford on the other. Clearly, the trier of fact has the right to make a reasonable credibility determination, and that determination can virtually never be manifestly erroneous. See, Rosell v. ESCO, 89-0607 (La.9/12/89), *603 549 So.2d 840, 844-845. Our review of the record as a whole convinces us that the trier of fact's decision to reject Ms. Cranford's version of the facts is a reasonable credibility call. The hearing officer noted that Ms. Cranford was "argumentative, evasive in her answers, and continually tried to divert the subject at hand." The hearing officer reviewed Ms. Cranford's own hand-written and signed narrative accounts of the incidents, submitted as exhibits to the proceedings, and found them to contain "multiple inconsistencies and sarcastic innuendos and statements that appeared to be designed to exonerate her from any wrong-doing while trying to discredit and/or intimidate her former employers."
This conclusion is supported by the following excerpts from Ms. Cranford's written statements. In her statement concerning the charge of abuse of M.C. in March of 2006, Ms. Cranford wrote:
The resident who complained was coached by CNAs working that night.... [I] overheard the CNAs engaging in inflammatory statements about me and how he should report me... I cast an eye to the 2 CNAs telling them I knew what they were up to.... Please contact eye witness to events that evening Margaret Kell, LPN ... She was present in the dining room and was not part of the conspiracy.... This nursing home needs to be investigated.
Ms. Kell's testimony at the hearing did not support Ms. Cranford's testimony concerning the incident.
In connection with the charge of abuse of F.L. at Pontchartrain, Ms. Cranford wrote:
They [Pontchartrain] were pleased as punch to have us [Ms. Cranford and her mother] until as Dale Cooney, the administrator stated to me "they told me not to hire you" referring to [Lacombe].
I am aware they are the same owners (ostensibly)they are sister nursing homes w/shared financial legacies, but I needed my mother where I could have accessmy car does not work well.
After not giving my mother (A-Hall) her Plavix & [illegible] for 30 straight days[8] and after coming to work one day and finding her covered in skin tearsboth arms & legs with one wound to her hand their daytime supervisor said needed stitchesI demanded she be moved to D-Hallthe hall I worked on. After thisimmediately after this, I was written up & suspended for turning down a TV (I was told to turn down) and discussing this w/the patient.
This time I was suspended & resigned because I closed a door.
The patient involved, [F.L.] was screaming at the top of his lungs for Amber (the C.N.A. who left the building without telling me). He became so loud he woke up [Mrs. G][9] who never ambulates & way at the other end of the hall & the suite of men next to him who had been resting peacefully. I called & called for help w/people trying to fall at both ends of the hall in their rooms and no one came, so I placed [F.L.] in his room and closed the door (he was threatening to ram the med cart w/his wheel chair), to keep the hall secure while I tried to locate the other LPN or Amber the CNA. The CNA finally appeared & stated she had a right to take a break & the LPN finally showed up & acted like he saved the day when he did NOTHING to help. Many times Beanie *604 Edwards LPN was called & not even in the facility so I guess the best defense is a good offense....
Once again, I don't know why these people are persecuting me, but I have never been reported in 25 years & I have never hurt anyone in all of my time as a nurse....
On June 5, 2006, Ms. Cranford wrote:
On 6/2/06-the nurse answering the call light asked me to turn down the TV in [Mrs. M's][10] rm.I approached her kindly & asked if I could turn down the TV a little bit. Her roommate's TV was blaring & her roommate was asleepso I turned it off. Later, as I entered the rm. w/ice, I heard her telling the CNA an inaccurate description of what happened and I told her she needed to report the truth. Resident was irrationally angry for absolutely no reason.
We do not find the hearing officer's characterization of Ms. Cranford's statements to be unreasonable.
Ms. Cranford contends that the evidence establishes only isolated incidents of "less than perfect composure" on her part, which must be considered in light of her over twenty-five years of nursing service, lack of prior formal disciplinary proceedings, lack of wrongful intent and lack of resulting harm to the residents.
Our review of the record in its entirety does not support Ms. Cranford's claim that she demonstrated merely less than perfect composure. The evidence of her unprofessional conduct in neglecting to feed M.C., in isolating F.L. and screaming at patients and co-workers goes beyond that characterization. We cannot say, based on the evidence of record, that there was no harm to M.C. To the contrary, there is evidence that her blood sugar level was significantly below normal and below her usual levels the morning after she was denied her supper. It also seems clear from the record that she suffered psychological and emotional injury by having been placed alone in a dimly lit area while her co-residents were enjoying their evening meal in the dining room. Likewise, the verbal abuse of E.F. and the isolation of F.L. cannot be said to have been non-injurious. Clearly, even a long record of exemplary service is not proof against actual evidence of subsequent negligent and abusive behavior.
We find no evidence that the Board was arbitrary or capricious in its decision. Professional boards exist, in part, to protect the public interest against licensed or certified professionals who violate the standards of their respective professions, whether intentionally, negligently, or from the absence of the emotional and psychological ability to cope with the demands of the profession.
In the alternative, Ms. Cranford claims that the Board denied her due process rights to reasonable notice and a fair hearing. Clearly, Ms. Cranford has a constitutionally protected property interest in her license as a Licensed Practical Nurse. The due process clauses of the constitutions of the United States[11] and the State of Louisiana[12] prohibit the state or its agencies from depriving Ms. Cranford of this property interest without due process of law. Due process essentially involves reasonable notice of the charges, resolution of which can result in the deprivation, and a meaningful opportunity to be heard as to those charges.
Ms. Cranford contends that the notice was insufficient in that it did not advise *605 her of the potential consequences of the adversarial hearing and of her rights at the hearing.
The formal complaint advised Ms. Cranford in detail of the charges that had been made against her. Attached to the complaint, and referred to in the complaint, was a full copy of the statutory provisions governing the administrative proceeding, including the nature of the disciplinary measures that could result, and Ms. Cranford's right to be represented by counsel.[13] The language used in the statute is clear and concise, enumerating the possible penalties and outlining the administrative procedure in plain English, understandable by a person of Ms. Cranford's educational background and experience. It is clear from her written statements that Ms. Cranford reads, writes and understands the English language. The questions she asked during the course of the hearing indicate perhaps an unwillingness to recognize the seriousness of the proceedings, but there is no evidence in the record that anything contained in the formal notice and its attachment was beyond her understanding and capability, were she to take the time to read the material thoughtfully and carefully.
Ms. Cranford relies on Tafaro's Investment Co. v. Division of Housing Improvement, 261 La. 183, 259 So.2d 57, 60-61 (1972), claiming that her notice was not reasonable considering the quality of the proceeding and the results which can obtain following the hearing. In that case, in the absence of a notice or hearing, a city agency, pursuant to the city's Minimum Housing Standards Code, contracted for the repair, at the plaintiff's expense, of the plaintiff's property. The city employed the following procedure: the housing administrator determined that the property violated certain minimum housing standards; the administrator then advised the owner that upon its failure to make necessary repairs, the owner could be charged with violations of the city code in Municipal Court, and/or the administrator could have the dwelling repaired and the cost of repairs would then become a lien against the property. The Code provided for service of notice on the owner, and for a hearing. The Louisiana Supreme Court held:
The giving of notice of a hearing by administrative agencies need only be reasonable and need not meet the exacting requirements for notice in judicial proceedings. The type of notice and the method of notice vary with the quality of the proceeding and the results which can obtain after hearing. Notice must serve the purpose of informing the parties of the nature and time of the proceedings, the purpose of the hearingi.e., the possible consequences or the manner in which interests may be affected, and the method of presenting objections to the administrative action. The United States Supreme Court put it in these terms: "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." [Citations omitted.]
The circumstances in the Tafaro's case that led the court to find the notice inadequate are clearly distinguishable from the facts of the instant case. In Tafaro's, the notice letter was an informal, casual, even solicitous communication stating that *606 the agency wished to discuss the housing requirements, that a hearing was scheduled so that the plaintiff could discuss the matter with the agency, that the agency wished to be of service, and that the matter could be discussed by phone to eliminate the necessity of appearing in person. The letter did not outline the possible consequences of an adverse ruling, or the manner of presenting any objection. The court found that the letter did not warn that a determination was to be made that would give the City the right to expend large sums of money in the repair of Tafaro's property for which the plaintiff would be assessed and its property liened. Furthermore, no hearing was ever held. While the city's code provided for notice and hearing, neither was afforded the plaintiff in the Tafaro's case. In stark contrast, Ms. Cranford was advised in clear English that serious consequences could follow from the hearing, including revocation of her nursing license. She was given notice of the hearing; she consented in writing to appear at the hearing, and did appear at a full evidentiary hearing.
Ms. Cranford argues that she was denied due process because she was not "urged" to obtain counsel. We find no authority and have been directed to none that would support the thesis that administrative due process requires that an educated professional be "urged" to obtain counsel. The notice clearly advised Ms. Cranford that she would be allowed, at her expense, to be represented by counsel.
Ms. Cranford contends that she somehow was prejudiced because the Board's Executive Director allegedly "prosecuted the case" with the Board's attorney. While Ms. Glaviano asked a few questions during the course of the hearing, it is not clear that she "prosecuted the case." Her questions essentially were points of clarification, and we find no prejudice to Ms. Cranford.
Ms. Cranford contends that the hearing officer made no effort to assist Ms. Cranford to develop the record, and claims that the officer allowed the Board's Counsel to "run roughshod" over Ms. Cranford. We find no evidence to support the claim that Board Counsel "ran roughshod" over Ms. Cranford. To the contrary, he was courteous, patient and helpful to the plaintiff. Board Counsel offered Ms. Cranford the opportunity to re-question the Board's witnesses, and reminded her to ask questions of the witnesses, rather than to testify and argue with them. At times during cross-examination, Ms. Cranford would begin to testify to her own version of events, whereupon Board Counsel advised her that she should ask questions of the witnesses. At the conclusion of the Board's case, Board Counsel advised Ms. Cranford that this was the appropriate time for her to present her testimony and evidence, if any, and she did testify fully at that point. We have been directed to no authority, nor has our independent research discovered any authority, to support Ms. Cranford's assertion that the hearing officer had a duty under the instant circumstances to assist her in developing the record.
We do not find that the record supports Ms. Cranford's claims that her testimony was "truncated due to frequent interruptions and objections by the Board's attorney and the hearing officer," or that she was prevented from presenting evidence that would have corroborated her testimony and/or undermined others' credibility. Indeed, Ms. Cranford does not set forth with specificity any evidence of this nature that she allegedly was prevented from introducing.
Board Counsel allowed Ms. Cranford great leeway in her questioning of witnesses. We note that much of Ms. Cranford's *607 questioning took the form of argument and testimony on her own behalf; however, it is clear from the transcript that the witnesses and Board representatives demonstrated patience and courtesy to Ms. Cranford throughout the hearing.
At the conclusion of her cross-examination, Ms. Ainsworth agreed to remain throughout the proceedings in the event that Ms. Cranford decided to ask her additional questions following the testimony of the other witnesses. Similarly, Ms. Sookoo, Ms. Smith, Ms. Kell, and Ms. Barnes remained available voluntarily after their cross-examinations for further questioning by Ms. Cranford, should she have wished to do so. Ms. Cranford did not recall any of the witnesses.
After the introduction of the Board's exhibits, Ms. Cranford was asked if she wished to offer any witnesses or documents. She replied:
Any witnesses I would have would be people that are employed by Pontchartrain and by Lacombe Nursing Center, so obviously it wouldn't be in their best interest to buck their own system.
Board Counsel then asked Ms. Cranford if she had no witnesses to call, and Ms. Cranford responded affirmatively, and said, "People who make blatant untrue comments." When counsel asked Ms. Cranford if she wished to recall any of the Board's witnesses, she replied, "I would like to talk to Beanie Edwards. Is there a possibility of talking to him? Because he made blatant untrue comments, completely untrue." Since Mr. Edwards was not a subpoenaed witness, he was not called and had not testified at the hearing. Ms. Cranford said she did not know she could have called her own witnesses, but admitted to having received a copy of the administrative procedure with the copy of her notice and formal complaint.
Ms. Cranford contends that the Board took action in violation of La.R.S. 49:957, which provides in pertinent part:
When in an adjudication proceeding a majority of the officials of the agency who are to render the final decision have not heard the case or read the record, or the proposed order is not prepared by a member of the agency, the decision, if adverse to a party to the proceeding other than the agency itself, shall not be made final until a proposed order is served upon the parties, and an opportunity is afforded to each party adversely affected to file exceptions and present briefs and oral argument to the officials who are to render the decision. The proposed order shall be accompanied by a statement of the reasons therefore and of the disposition of each issue of fact or law necessary to the proposed order, prepared by the person who conducted the hearing or by one who has read the record. No sanction shall be imposed or order be issued except upon consideration of the whole record and as supported by and in accordance with the reliable probative, and substantial evidence. The parties by written stipulation may waive, and the agency in the event there is no contest may eliminate, compliance with this Section. [Emphasis added.]
The record contains no evidence to support Ms. Cranford's claim that the members of the Board did not read the record of the case prior to making their decision to accept the Hearing Officer's recommendations.
Finally, Ms. Cranford contends that this Court should reverse the Board's decision outright, modify it to a reprimand or at most to a suspension for the time that Ms. Cranford has been without her nursing license. Applying the manifest error standard of review to the findings of fact below, *608 and both the presumption of validity and propriety and the principle that the trial court may not substitute its judgment for the rationally-based judgment of the Board, we affirm the judgment of the trial court affirming the decision and order of the Board dated April 27, 2007, and denying Ms. Cranford's request for a Declaratory Judgment.
AFFIRMED.
BELSOME, J., concurs in the result.
NOTES
[1] The record copy of the Formal Complaint lodged against the plaintiff bears the date "February, 2007".
[2] In the interest of the resident's privacy, we shall refer to her as "M.C."
[3] In the interest of the residents' privacy, we shall refer to them as "E.F." and "T.F."
[4] M.C.'s normal morning blood sugar was in the low 100s, and on average not under 80. A "normal" reading would be between 60 and 110. On the morning in question, M.C.'s blood sugar reading was 39.
[5] Rhonda Clark, the prior Director of Nursing, reported that Ms. Cranford had not administered medication at the proper time or, perhaps, at all, since the medicine in question was found at the resident's bedside. Ms. Cranford was counseled. Ms. Ainsworth wrote up Ms. Cranford's use of company equipment on company time to take care of personal business. Ms. Cranford again was counseled.
[6] In the interest of the resident's privacy, we shall refer to him as "F.L."
[7] The record does not contain a copy of the trial court's findings of fact, if any.
[8] There is no evidence in the record that Ms. Cranford reported these deficiencies to the Board.
[9] A resident.
[10] A resident.
[11] U.S. Const. amends. V and XIV.
[12] La. Const. Art. I, § 2.
[13] La. Admin. Code 46:306 M(1) provides that all costs incurred by a respondent as a result of his or her exercise of this right shall be the sole responsibility and obligation of the respondent.